2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit



8-29-2000

# Johnson v. West Suburban Bank

Precedential or Non-Precedential:

Docket 00-5047

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Johnson v. West Suburban Bank" (2000). *2000 Decisions*. Paper 180.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/180

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 29, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-5047

TERRY JOHNSON

v.

WEST SUBURBAN BANK; TELE-CASH INC.;
COUNTY BANK OF REHOBOTH BEACH, DELAWARE

Tele-Cash Inc.; County Bank of Rehoboth Beach, Delaware,
Appellants

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 99-cv-00104)
District Judge: Honorable Gregory M. Sleet

Argued July 17, 2000

Before: BECKER, Chief Judge, SLOVITER and
NYGAARD, Circuit Judges.

(Filed: August 29, 2000)

        WALTER WEIR, JR., ESQUIRE
        SUSAN VERBONITZ, ESQUIRE
         (ARGUED)
        Weir and Partners, LLP
        1339 Chestnut Street
        Suite 500, The Widener Building
        Philadelphia, PA 19107

JAMES D. GRIFFIN, ESQUIRE
Griffin & Hackett
116 West Market Street
Mellon Bank Building
Georgetown, DE 19947

Counsel for Appellants

CATHLEEN M. COMBS, ESQUIRE
 (ARGUED)
JOHN M. BRODERICK, ESQUIRE
Edelman, Combs & Latturner
120 South LaSalle Street, 18th Floor
Chicago, IL 60603

WILLIAM L. O'DAY, JR., ESQUIRE
Law Office of William L. O'Day, Jr.
2118 Kirkwood Highway
Wilmington, DE 19805

Counsel for Appellee

CHRISTOPHER R. LIPSETT,
 ESQUIRE
ERIC J. MONGILNICKI, ESQUIRE
MICHAEL D. LEFFEL, ESQUIRE
Wilmer, Cutler & Pickering
2445 M Street, NW
Washington, DC 20037-1420

Counsel for Amici Curiae –
The Delaware Retail Council; The
New Jersey Retail Merchants
Association; The Pennsylvania
Retailers Association

RICHARD P. ECKMAN, ESQUIRE
STEPHEN G. HARVEY, ESQUIRE
JEFFREY K. TECHENTIN, ESQUIRE
Pepper Hamilton, LLP
3000 Two Logan Square
Philadelphia, PA 19103-2799

Counsel for Amici Curiae –
American Bankers Association,
American Financial Services
Association, Consumer Bankers
Association, and Delaware Bankers
Association

OPINION OF THE COURT

BECKER, Chief Judge.

This appeal arises under the Truth in Lending Act ("TILA"), 15 U.S.C. S 1601 et seq. , and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. S 1693 et seq. Plaintiff Terry Johnson, who entered into a short-term loan agreement with County Bank of Rehoboth Beach, Delaware ("Bank"), contends that the terms of the loan violated both the TILA and the EFTA. He seeks to bring a class action suit against both the Bank and Tele-Cash, Inc., which acted as the Bank's agent for the loan transaction. The Defendants respond that the dispute belongs in an arbitral forum, as the loan agreement signed by Johnson contains an arbitration clause. This appeal presents the question, one of first impression in the Courts of Appeals, whether claims under the TILA and the EFTA can be referred to arbitration under an arbitration clause when a plaintiff seeks to bring a claim on behalf of multiple claimants.

Johnson submits that compelling arbitration is precluded by an "irreconcilable conflict" between the arbitration clause and the purposes of the TILA and the EFTA. He argues that Congress consciously inserted language into the statutes with the intent of encouraging district court judges to certify class actions under Fed. R. Civ. P. 23. He further maintains that in the legislative history of

3

amendments to the TILA, Congress communicated that class action remedies play a central role in the TILA and EFTA enforcement schemes. Rather than simply provide restitution, Johnson asserts, such litigation is meant to serve public policy goals through plaintiffs who act as private attorneys general, for the class action device is necessary to ensure meaningful deterrence to creditors who might violate the acts.

The District Court agreed with Johnson that there was an "inherent conflict" between compelling arbitration and the TILA and the EFTA and denied the Defendants' motion to compel arbitration under the agreement. We will reverse. Though there may be some tension between the purposes of the debtor-protection statutes and arbitration, we are not persuaded that the two are so at odds as to preclude arbitration in this context. The Supreme Court has made clear that the presumption in favor of arbitration established by the Federal Arbitration Act ("FAA"), 9 U.S.C. S 1 et seq., is a powerful one. Because neither the TILA nor the EFTA explicitly precludes the selection of arbitration instead of litigation, a party who agrees to arbitrate, but then asserts that his or her statutory claim cannot be vindicated in an arbitral forum, faces a heavy burden. That burden has not been met here.

As a predicate to this conclusion, we note our belief that the public interest purposes behind the civil penalty provisions of the statutes are not in conflict with arbitration, even if arbitration clauses may prevent the bringing of class actions. To the extent that class actions serve public interest goals, those goals are also met by other provisions of the laws, which allow for enforcement of the statutes by federal agencies that possess sufficient sanctioning power to provide a meaningful deterrent to creditors who violate the terms of either act. Moreover, neither act grants potential plaintiffs any substantive right that cannot be vindicated in an arbitral forum. While it may be true that the benefits of proceeding as a class are unavailable in arbitration, neither statute confers upon plaintiffs the right to proceed as a class. Instead, the right is merely a procedural one, arising under Fed. R. Civ. P. 23, that may be waived by agreeing to an arbitration clause. In

4

sum, because we can discern no congressional intent to preclude the enforcement of arbitration clauses in either statute's text, legislative history, or purpose, we hold that such clauses are effective even though they may render class actions to pursue statutory claims under the TILA or the EFTA unavailable.

I.

Johnson applied for and received a short-term loan for $250 from the Bank on July 10, 1998. The loan agreement disclosed an annual percentage rate of 917%, stemming from finance charges of $88 for the two-week loan. Thus, under the agreement, Johnson had to repay the loan by making one payment of $338 two weeks after receiving his $250. The loan agreement also contained the following arbitration clause:

> You and we agree that any claim, dispute, or controversy between us . . . and any claim arising from or relating to this Note, no matter by whom or against whom . . . including the validity of this Note and of this agreement to arbitrate disputes as well as claims alleging fraud or misrepresentation shall be resolved by binding arbitration by and under the Code of Procedure of the National Arbitration Forum . . . . This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. [SS] 1-16.

App. 20. The loan agreement further provided:

> NOTICE: YOU AND WE WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.
>
> By signing and sealing below, you agree to all of the terms of this Note, including the agreement to arbitrate disputes.

Id. at 20.

Johnson filed suit on behalf of a putative class in the District Court for the District of Delaware, alleging that the Bank and Tele-Cash, Inc., the bank's agent for the loan transaction, violated both the TILA and the EFTA by failing to properly disclose the high rate of interest, and by requiring loan applicants to open accounts from which they were required to irrevocably preauthorize electronic fund transfers to pay the loan.

The Defendants moved to stay the proceedings and compel arbitration. Concluding that arbitration was at odds with the purposes of the TILA and the EFTA, the District Court denied a motion to compel arbitration and stay the proceedings or dismiss the case. The District Court did, however, dismiss Johnson's claim that the arbitration clause was unconscionable. The Defendants timely appealed. The District Court had jurisdiction to hear Johnson's action under 28 U.S.C. S 1331. Though the District Court's refusal to compel arbitration was interlocutory, such refusals are immediately appealable under the FAA. See 9 U.S.C. S 16(a) ("An appeal may be taken from . . . an order . . . refusing a stay of any action under section 3 of this title [or] denying a petition under section 4 of this title to order arbitration to proceed."). The question whether the TILA and the EFTA preclude arbitration when the plaintiff seeks to assert claims on behalf of a class presents a question of law over which our review is plenary.

II.

Whether a court can compel arbitration of TILA claims when the parties' loan agreement contains an arbitration clause but the plaintiff seeks to bring claims on behalf of multiple claimants is a question of first impression for this court. No other federal appellate court has squarely addressed the issue either. A number of district courts have ruled on the subject. Most of these rulings favor the view that the TILA does not preclude the pre-dispute selection by the parties of an arbitral forum should any controversy arise. Compare Thompson v. Illinois Title Loans, Inc., No. 99-C-3952, 2000 WL 45493 (N.D. Ill. Jan. 11, 2000); Sagal v. First USA Bank, N.A., 69 F. Supp. 2d 627 (D. Del. 1999);

6

Stout v. Byrider, 50 F. Supp. 2d 627 (N.D. Ohio 1999);
Randolph v. Green Tree Fin. Corp., 991 F. Supp. 1410 (M.D.
Ala. 1997), rev'd on other grounds, 178 F.3d 1149 (11th Cir.
1999), cert. granted, 120 S. Ct. 1552 (Apr. 3, 2000); Lopez
v. Plaza Fin. Co., No. 95-C-7567, 1996 WL 210073 (N.D. Ill.
April 25, 1996); Meyers v. Univest Home Loan, Inc., No. C-
93-1783 MHP, 1993 WL 307747 (N.D. Cal. Aug. 4, 1993),
with Lozada v. Dale Baker Oldsmobile, Inc., 91 F. Supp. 2d
1087 (W.D. Mich. 2000).

In general, nothing prevents contracting parties from
including a provision in their agreements that refers
statutory claims arising under the contract to arbitration.
See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20,
26 (1991). Arbitration of statutory claims will not be
precluded absent congressional direction. "Having made the
bargain to arbitrate, the party should be held to it unless
Congress itself has evinced an intention to preclude a
waiver of judicial remedies for the statutory rights at issue."
Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473
U.S. 614, 628 (1985). The burden of establishing that
Congress meant to preclude arbitration for a statutory
claim rests with the party who seeks to avoid arbitration.
See Gilmer, 500 U.S. at 26. Such intention may be found in
the text, legislative history, or in an "inherent conflict"
between arbitration and the statute's underlying purposes.
Id. (citing Shearson/American Express, Inc. v. McMahon,
482 U.S. 220, 227 (1987)). "Throughout such an inquiry, it
should be kept in mind that `questions of arbitrability must
be addressed with a healthy regard for the federal policy
favoring arbitration.' " Id. (quoting Moses H. Cone Mem'l
Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).

It is the third category, inherent conflict, on which the
District Court based its opinion. The Court concluded that
an inherent conflict existed because "without the possibility
of class action liability looming on a creditor's horizon,
there is a very real possibility that these entities will not
voluntarily comply with the Truth-in-Lending regulations."
Johnson v. Tele-Cash, Inc., 82 F. Supp. 2d 264, 271 (D. Del.
1999). We agree that if Johnson is to prevail, it must be on
the basis of demonstrating an inherent conflict. There is
nothing in either the text or the legislative history of the

7

TILA to indicate that Congress intended to allow plaintiffs to avoid binding arbitration clauses. Both the statute and the legislative history, however, offer insight into the question whether an "inherent conflict" is to be found between the statute and arbitration.

A. Statutory Language

The TILA provides for civil liability for lenders who fail to give the disclosures required by the statute. See 15 U.S.C. S 1640. An aggrieved party is entitled to recover actual as well as statutory damages. Statutory damages can be twice the amount of any finance charge, but, for most transactions, they may not exceed $1,000 or fall short of $100. See id. SS 1640(a)(1), (2). The statute specifically addresses the damages available in a class action, limiting the maximum potential recovery. Plaintiffs can recover

> in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor.

Id. S 1640(a)(1)(B). The statute further directs that

> [i]n determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

Id. S 1640(a).

Though the statute clearly contemplates class actions, there are no provisions within the law that create a right to bring them, or evince an intent by Congress that claims initiated as class actions be exempt from binding arbitration clauses. The "right" to proceed to a class action,

8

insofar as the TILA is concerned, is a procedural one that arises from the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23.

B. Legislative History

Johnson relies heavily on the legislative history behind several amendments to the TILA. After the law wasfirst enacted, some courts were reluctant to certify class actions, in part due to the concern that large class awards could overwhelm lending institutions. See generally Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412, 414 (S.D.N.Y. 1972) (refusing to certify class of TILA plaintiffs when "the allowance of thousands of minimum recoveries like plaintiff 's would carry to an absurd and stultifying extreme the specific and essentially inconsistent remedy Congress prescribed as the means of private enforcement"). In 1974 Congress responded by enacting the limitations on class action recovery discussed above. In so doing, it created some legislative history that bespeaks the potential role that class actions are meant to play in the enforcement of the TILA's substantive requirements. Johnson contends that this history demonstrates Congress's intent to preserve a statutory class action remedy under the TILA.

Most of the language favorable to Johnson is found in a report of the Senate Committee on Banking, Housing and Urban Affairs pertaining to the 1974 amendments. We quote from it at length.

> A problem has arisen in applying these minimum liability provisions in class action suits involving millions of consumers. If each member of the class is entitled to a minimum award of $100, a creditor's liability can be enormous. For example, if a large national department store chain with 10 million customers fails to include a required item of information on its monthly billing statement, it can be subject to a minimum liability of $1 billion in a class action suit
>
> . . . .
>
> The purpose of the civil penalties section under Truth in Lending was to provide creditors with a

meaningful incentive to comply with the law without relying upon an extensive new bureaucracy. However, the Committee feels this objective can be achieved without subjecting creditors to enormous penalties for violations which do not involve actual damages and may be of a technical nature. Putting a reasonable limit on a creditor's maximum class action liability would seem to be in the best interest of both creditors and consumers.

. . . .

 . . . . The Committee believes the present ambiguities and uncertainties with respect to class action suits under Truth in Lending should be clarified. Moreover, the Committee agrees with the Federal Reserve Board that "potential class action liability is an important encouragement to the voluntary compliance which is so necessary to insure nationwide adherence to uniform disclosure" and that such remedies should not be restricted to actual damages. As the Committee pointed out in its report on similar legislation last year,"Most Truth in Lending violations do not involve actual damages and . . . some meaningful penalty provisions are therefore needed to insure compliance."

 Accordingly, the Committee again decided to place an aggregate limitation on a creditor's class action liability for violations not involving actual damages.

S. Rep. No. 93–278, at 14–15 (1973). The conference report for the final legislation is far less expansive, not discussing the purposes of the caps in any great detail, but stating that "[t]he limitation on class action suits was further limited to the lesser of $100,000 or 1 percent of the net worth of the creditor to protect small businessfirms from catastrophic judgments." H.R. Conf. Rep. No. 93–1429 (1974), reprinted in 1974 U.S.C.C.A.N. 6148, 6153.

Several years later, the cap on class action awards was raised from $100,000 to $500,000. At the time, the Senate report, prepared by the Banking, Housing and Urban Affairs Committee, noted:

    The chief enforcement tool will continue to be private actions for actual damages and civil penalties. . . .

10

. . . . The risk of any ceiling on class action recoveries is that, if it is too low, it acts as a positive disincentive to the bringing of such actions and thus frustrates the enforcement policy for which class actions are recognized. . . .

The Committee wishes to avoid any implication that the ceiling on class action recovery is meant to discourage use of the class action device. The recommended $500,000 limit, coupled with the 1% formula, provides, we believe, a workable structure for private enforcement. Small businesses are protected by the 1% measure, while a potential half million dollar recovery ought to act as a significant deterrent to even the largest creditor.

S. Rep. No. 94-590, at 8 (1976), reprinted in 1976 U.S.C.C.A.N. 431, 438.

Though Congress did not address the role of arbitration in the legislative history, Johnson urges that the history recited above demonstrates the centrality of class actions to the TILA's effective enforcement.[1] Accordingly, we turn to consider whether an arbitration clause that precludes bringing a class action suit under the TILA irreconcilably conflicts with the statute.

C. Statutory Purposes

Because nothing in the legislative history or the statutory text of the TILA clearly expresses congressional intent to preclude the ability of parties to engage in arbitration, Johnson must demonstrate that arbitration irreconcilably conflicts with the purposes of the TILA. While Johnson may be correct in arguing that Congress contemplated class actions as a part of the TILA enforcement scheme, and even that class actions were self-consciously promoted by Congress in amending the statute, he falls short of

_____

1. Insofar as the committee did endorse class actions, it should be noted that the endorsement was not unequivocal. The committee said it would be considering alternatives to class actions in the future, adding "[w]e are hopeful that there may be workable and effective substitutes for the class action as a consumer enforcement device . . . ." Id.

11

demonstrating irreconcilable conflict between arbitration and the TILA.

1. TILA's public policy goals

Johnson focuses on the ability of a class action award to act as a penalty against lenders who violate the TILA. This focus is logical. The prospect of a class action award will doubtless deter TILA violations more effectively than the prospect that debtors will pursue individual actions, either in court or in arbitration, because the damages available to individuals are generally limited. See 15 U.S.C. S 1640. In this manner, argues Johnson, class actions are central to TILA's purposes, because the statute's civil damages provisions are not remedial, but rather, given the frequent absence of actual damages, are designed to deter unfair credit practices. Phrased another way, the TILA, in Johnson's submission, is meant to encourage private attorneys general, and the statute as a whole is intended for public purposes rather than private grievances. While these arguments carry force, they are ultimately unpersuasive, for they do not translate into a conclusion that class actions are necessary to provide deterrence or fulfill any of the other goals of the Act.

a. The effects of arbitration on private litigation

First, even if plaintiffs who sign valid arbitration agreements lack the procedural right to proceed as part of a class, they retain the full range of rights created by the TILA. These rights remain available in individual arbitration proceedings. The Supreme Court has made clear that when arbitration will preserve a plaintiff 's substantive rights, compelling arbitration in accordance with an arbitration clause will not impede a statute's deterrent function. "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 (1985). Johnson does not argue that the arbitral forum selected in his agreement is somehow inadequate to vindicate any of his rights under the TILA or that arbitrators would be unable to afford him any relief that he could individually obtain in

12

a court proceeding, including injunctive relief or attorney's fees. Cf. Randolph v. Green Tree Fin. Corp., 178 F.3d 1149, 1158 (11th Cir. 1999), cert. granted, 120 S. Ct. 1552 (Apr. 3, 2000) (reversing order compelling arbitration in a TILA case because the clause at issue "raises serious concerns with respect to filing fees, arbitrators' costs and other arbitration expenses that may curtail or bar a plaintiff 's access to the arbitral forum"); Baron v. Best Buy Co., Inc., 75 F. Supp. 2d 1368, 1370 (S.D. Fla. 1999) (appeal pending) (refusing to compel arbitration in a TILA case when arbitration agreement required parties to bear own expense for attorneys' costs in contravention of TILA provisions that provide for recovery of attorneys' fees).

Under the prevailing jurisprudence, when the right made available by a statute is capable of vindication in the arbitral forum, the public policy goals of that statute do not justify refusing to arbitrate. The notion that there is a meaningful distinction between vindicating a statute's social purposes and adjudicating private grievances for purposes of determining whether a statute precludes compelling arbitration under a valid arbitration clause was rejected by the Supreme Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991). That case concerned whether claims under the Age Discrimination in Employment Act ("ADEA") must be available in a judicial forum. The Court concluded otherwise, despite arguments based on the ADEA's important social policy goals. "As Gilmer contends, the ADEA is designed not only to address individual grievances, but also to further important social policies. We do not perceive any inherent inconsistency between those policies, however, and enforcing agreements to arbitrate age discrimination claims." Id. at 27 (citation omitted). Class actions could be similarly effective in promoting the ADEA's social policies, and, as discussed below, that statute lends itself more easily to being construed as creating a substantive right to a class action. Gilmer therefore appears to foreclose much of Johnson's argument.

We also note that while arbitrating claims that might have been pursued as part of class actions potentially reduces the number of plaintiffs seeking to enforce the TILA

13

against creditors, arbitration does not eliminate plaintiff incentives to assert rights under the Act. The sums available in recovery to individual plaintiffs are not automatically increased by use of the class forum. Indeed, individual plaintiff recoveries available in a class action may be lower than those possible in individual suits because the recovery available under TILA's statutory cap on class recoveries is spread over the entire class. Nor will arbitration necessarily choke off the supply of lawyers willing to pursue claims on behalf of debtors. Attorneys' fees are recoverable under the TILA, see 15 U.S.C. S 1640(a)(3), and would therefore appear to be recoverable in arbitration, as arbitrators possess the power to fashion the same relief as courts.[2] In sum, though pursuing individual claims in arbitration may well be less attractive than pursuing a class action in the courts, we do not agree that compelling arbitration of the claim of a prospective class action plaintiff irreconcilably conflicts with TILA's goal of encouraging private actions to deter violations of the Act. Whatever the benefits of class actions, the FAA"requires piecemeal resolution when necessary to give effect to an arbitration agreement." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co., 460 U.S. 1, 20 (1985) (emphasis in the original).

b. The availability of administrative enforcement
        mechanisms

Our conclusion that there is no irreconcilable conflict between the TILA's social policy goals and arbitration of claims that could have been heard as part of a class action is bolstered by the statute's administrative enforcement provisions. These provisions offer meaningful deterrents to violators of the TILA if private enforcement actions should

_____

2. There does not appear to be a problem with securing the full range of remedies available under the TILA in this case because Rule 20(d) of the National Arbitration Forum, the arbitrators selected in the parties' contract, currently authorizes arbitrators to "grant any remedy or relief allowed by applicable substantive law and based on a Claim, Response, or Request properly submitted by a Party under this Code." Of course if the arbitral rules in question precluded the substantive relief made available by the statute, or the forum otherwise presented barriers to a plaintiff 's assertion of his or her rights, we would have a different case.

fail to fulfill that role. The statute gives general enforcement power to the Federal Trade Commission as the "overall enforcing agency," and permits it to employ its powers under the Federal Trade Commission Act, see 15 U.S.C. S 1607(c), such as the issuing of cease and desist orders, see 15 U.S.C. S 45. The TILA also grants enforcement authority to the variety of federal agencies that have jurisdiction over various lending institutions, including the Office of the Comptroller of the Currency, the Federal Reserve Board, and the FDIC. See 15 U.S.C.S 1607(a). In addition to allowing these federal agencies to order the adjustment of inaccurately disclosed finance charges, see id. S 1607(e), the TILA cross references section 8 of the Federal Deposit Insurance Act, 12 U.S.C. S 1818, to set forth other enforcement powers, see 15 U.S.C. S 1607(a). Therefore the agencies may, for example, impose monetary penalties of up to $5,000 per day (or of $25,000 per day if the violations are part of a pattern of misconduct), see 12 U.S.C. S 1818(i), or in some instances order the suspension and removal of institution directors or officers, see 12 U.S.C. S 1818(e).

Johnson responds by invoking the portion of the legislative history that speaks to the need to avoid"relying upon an extensive new bureaucracy." S. Rep. No. 93-278, at 14 (1973). This reference is of limited usefulness, for this snippet of legislative history does not indicate congressional intent that arbitration be precluded, or that individual actions are inadequate to serve the function of deterring violations of the TILA. It may be true that Congress saw value in maintaining the availability of class actions, but that does not translate to the conclusion that it intended to preclude private parties from contracting around their availability. Under the framework established by the Supreme Court, legislative history may be used to demonstrate congressional intent to preclude arbitration. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991). When that history is used, as here, merely to demonstrate that the judicial remedies provided for or contemplated by a statute are important, it is of noticeably reduced value. The importance of statutory judicial remedies are always evident from their mere existence-- Congress obviously enacted them for a reason. Were they

15

not the object of a congressional goal, they would not have been enacted. It is therefore hard to see how the legislative history relied upon by Johnson could possibly be dispositive.[3]

Insofar as Congress's intent, broadly contemplated, is concerned, we must give equal consideration to Congress's policy goals in enacting the FAA. The statute was intended to overcome judicial hostility to agreements to arbitrate, see Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219-21 & n.6 (1985), and it reflects "a liberal federal policy favoring arbitration agreements," see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co., 460 U.S. 1, 24 (1983). See also H.R. Rep. No. 68-96, at 1 (1924) ("Arbitration agreements are purely matters of contract, and the effect of this bill is simply to make the contracting party live up to his agreement."). Indeed, a Senate Judiciary Committee Report supporting the legislation explained that arbitration provides benefits to both consumers and businesses in speed and lower costs. "The desire to avoid the delay and expense of litigation persists. The desire grows with time and as delays and expense increase. The settlement of disputes by arbitration appeals to big business and little business alike, to corporate interests as well as to individuals." S. Rep. No. 68-536, at 3 (1924).

Similarly, the committee found that there was general satisfaction among participants with arbitration. See id. A 1982 House of Representatives report reached similar

_____

3. Moreover, even if legislative history were dispositive, there is similar
history accompanying the original version of the TILA that indicates the importance of administrative enforcement in securing the rights of most consumers. The House Report, prepared by the Committee on Banking and Currency, explained that enforcement on the administrative level was essential to the legislative purpose of the Act. See H.R. Rep. No. 90-1040 (1968), reprinted in 1968 U.S.C.C.A.N. 1962, 1975. "For the relatively unsophisticated consumer, particularly those of modest means, administrative enforcement will provide their only protection against unscrupulous merchants or lenders." Id. The report also characterizes the civil remedies as secondary to the administrative ones. "While primary enforcement of the bill would be accomplished under the administrative enforcement section discussed above, further provision is made for the institution of civil action by an aggrieved debtor." Id. at 1976.

conclusions, stating that "[t]he advantages of arbitration are many: it is usually cheaper and faster than litigation; it can have simpler procedural and evidentiary rules; it normally minimizes hostility and is less disruptive of ongoing and future business dealings among the parties; [and] it is often more flexible in regard to scheduling . . . ." H.R. Rep. No. 97-542, at 13 (1982). These benefits have been similarly recognized by the Supreme Court as being part of Congress's intent in passing the FAA. See Allied-Bruce Terminix Co. v. Dobson, 513 U.S. 265, 280 (1995) (citing the 1924 Senate Report and the 1982 House Report). We therefore cannot consider the legislative history relied upon by Johnson without giving equal heed to the clear congressional policy behind the FAA.

In short, Johnson's reliance on the legislative history summarized in Part II.B is fundamentally flawed. He uses it not to show that Congress intended that parties could avoid a valid arbitration clauses if they wished to litigate a TILA claim, but rather, and in a more attenuated manner, to show that class actions have important purposes under the statute. But nothing in the cited passages demonstrates that parties cannot choose to waive judicial remedies in favor of arbitration. In any case, the loss of the availability of a class action does not mean the loss of meaningful deterrence to TILA violations, insofar as the public remedies discussed above remain. It may be true that the unavailability of class actions removes an incentive for lenders to comply with the statute, but it is far from the only incentive to do so.

We similarly do not view the fact that Congress seems to have self-consciously encouraged class actions as particularly telling. In acting to ease the certification of classes, see supra Part II.B, Congress did nothing to preserve the right to a class action over arbitration or preclude opting for arbitration. Rather, it only altered the factors that judges consider in determining whether to allow the procedural right of a class action to be exercised. Notably, Congress did not add language compelling judges to recognize prospective classes under any circumstances. One can therefore look at the 1974 and 1976 amendments as efforts by Congress to place class actions on the same

17

footing as any other lawsuit, no more or less subject to arbitration than a cause of action arising under any other statute.

2. Substantive Rights

Johnson also argues that the TILA does effectively create an unwaivable right to bring a class action. The strongest statement of this argument is as follows. Congress enacted a scheme in which the court hearing a class action could set a damage figure up to a certain amount for certain patterns of conduct. This judicial flexibility in imposing damages up to $500,000 only exists if a class action is allowed, as individual plaintiff claims are generally capped at $1,000. Therefore, a right of classes to a judicially crafted punitive remedy is lost if this court orders arbitration of Johnson's claims. Similarly, if class actions are precluded, arbitrators acting in lieu of courts would not have a basis for considering, in connection with a class remedy, the frequency and persistence of compliance failures by the creditors, the number of persons adversely affected, or the creditors' intent. See 15 U.S.C. S 1640(a).[4]

This argument is unavailing in light of Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991). The ADEA, at issue in Gilmer, presented far more powerful textual support than the TILA for concluding that there is a right to proceed collectively despite the existence of an arbitration clause. The ADEA actually provides for collective litigation. See 29 U.S.C. S 626(b) (referencing the remedies in 29 U.S.C. S 216). "An action . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one

_____

4. This court has never addressed the question whether class actions can be pursued in arbitral forums, though it appears impossible to do so unless the arbitration agreement contemplates such a procedure. See Champ v. Siegel Trading Co., 55 F.3d 269, 274-75 (7th Cir. 1995). At oral argument, the parties indicated that the rules of the National Arbitration Forum, which govern the arbitration agreement here, preclude the joinder of actions unless all parties affirmatively consent. We therefore assume, for purposes of this appeal, that Johnson's effort to pursue his claims as a representative of a class would be precluded by enforcement of the arbitration clause.

18

or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. S 216(b) (emphasis added). In short, the statute creates a right to sue collectively, which is not similarly created by the TILA. Yet the Supreme Court still ruled that the ADEA did not preclude arbitration notwithstanding the unavailability of the class action remedy there (and also notwithstanding all of the public interests vindicated by the statute as discussed above in Part II.C.1). See Gilmer, 500 U.S. at 32.

Johnson argues that Gilmer is taken out of context vis-a-vis the provision for class actions because the Supreme Court noted that the EEOC, in enforcing the ADEA, could still seek class-wide relief, while the FTC is not similarly capable. We do not believe that this argument carries any force. As discussed above, powerful punitive enforcement mechanisms remain available to administrative bodies under the Act even if these tools are not in the form of class actions.

Furthermore, simply because judicial remedies are a part of a law does not mean that Congress meant to preclude parties from bargaining around their availability. This is manifest in the Supreme Court's treatment of the availability of class actions in Gilmer."But `even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred.' " Gilmer, 500 U.S. at 32 (quoting Nicholson v. CPC Int'l Inc., 877 F.2d 221, 241 (3d Cir. 1989) (Becker, J., dissenting)) (alteration in the original). The same holds true for the TILA. Even if we were to conclude that the statute implies a right to proceed as a member of a class, Gilmer indicates that rights of this nature are waivable so long as the rights the statute was designed to protect may be vindicated by other means. We do not think this unfair. Only those who consent to credit agreements with binding arbitration clauses are forced to abandon this procedural avenue; those who do not consent

19

to arbitration in their contracts have the full selection of forums.5

In sum, Johnson's arguments that the TILA precludes arbitration are unpersuasive. "[I]f Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial

_____

5. Of course even when arbitration clauses are included in agreements, they may be set aside if they are fraudulently induced or are in some way unconscionable. As noted above, Johnson did allege that his arbitration clause was unconscionable, but the District Court found no basis for the conclusion that the clause was in any way oppressive, in large part because the clause did not create an arbitration procedure that favors one party over another. See Johnson v. Tele-Cash, Inc., 82 F. Supp. 2d 264, 279 (D. Del. 1999). Though Johnson complains on appeal that the arbitration clause was a contract of adhesion, he does not make any argument to contradict the District Court's conclusion that the arbitration clause is not unconscionable.

Johnson also claims that waiver of judicial remedies through a contract of adhesion violates the Equal Credit Opportunity Act ("ECOA"), which prohibits discrimination against any credit applicant who exercised a right created under the chapter of the U.S. Code that includes the TILA. See 15 U.S.C. S 1691. But Johnson does not properly allege that there has been any discrimination, or that he exercised any right under any act. Johnson's purported authority for the proposition that the ECOA is applicable is Owens v. Magee Fin. Serv., 476 F. Supp. 758 (E.D. La. 1979), and Bryson v. Bank of New York, 584 F. Supp. 1306 (S.D.N.Y. 1984). Both cases, however, presented strikingly different facts from those at issue here, as they involved oppressive conduct against individuals who actively sought to assert rights under the TILA. In Owens, a creditor defendant, already being sued for a TILA violation by the debtor, made additional credit contingent on the debtor's signing a settlement document of her active lawsuit. See Owens, 476 F. Supp. at 768. Bryson involved a denial of a loan application simply because an applicant inquired about the ability to obtain a loan without taking credit insurance. This was a violation because TILA provides consumers with the right to refuse to purchase such insurance unless the premium is included in the statement of the finance charge of the loan. See Bryson, 584 F. Supp. at 1318.

These differences aside, Johnson plainly cannot claim that Defendants' conduct violated the ECOA or its implementing regulation because, as we discuss in the text, we hold today that the arbitration clause contained in the loan agreement did not serve to deprive Johnson of any rights held under the TILA.

forum, that intention will be deducible from text or legislative history." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985). No such intent is deducible here.

III.

The District Court further held that compelling arbitration of claims arising under the EFTA irreconcilably conflicts with that statute as well. This ruling was based on the fact that the EFTA contains limitations on class action recovery that mirror those contained in the TILA. Compare 15 U.S.C. S 1640(a), with 15 U.S.C.S 1693m(a). The District Court inferred that Congress's use of identical language bespoke identical goals, and that Congress was seeking to encourage the certification of class actions under the EFTA as it had under the TILA. Because the Court had concluded that this goal created an inherent conflict with arbitration in the TILA context, it followed that the same conflict was manifest when EFTA claims were arbitrated. See Johnson v. Tele-Cash, Inc., 82 F. Supp. 2d 264, 272 (D. Del. 1999). While we agree that resolution of the arbitration issue with respect to TILA claims would also apply to the EFTA, our disagreement with the District Court about whether the TILA precludes compelling arbitration commands a similarly contrary conclusion about the EFTA issue. The EFTA's class action language was drafted in 1978, after the identical language was placed in the TILA by the 1974 and 1976 amendments. See Electronic Fund Transfer Act, Pub. L. No. 95-630, S 915, 92 Stat. 3737 (1978) (codified at 15 U.S.C. S 1693m(a)). We do not believe that Congress would have different intended meanings for identical statutory language contained in similar statutes. Because there is no irreconcilable conflict between arbitration and the goals of the TILA, we similarly hold that claims arising under the EFTA may also be subject to arbitration notwithstanding the desire of a plaintiff who previously consented to arbitration to bring his or her claims as part of a class.

The order of the District Court denying the motion to stay proceedings and compel arbitration will be reversed and the

21

case remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

22